IN THE
# UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Mark Spotz_____, | ✧ | |
| *Plaintiff,* | ✧ | |
| v. | ✧ | No. _1:21-cv-1799 CCC_ |
| John Wetzel, *et al.,* | ✧ | |
| *Defendants.* | ✧ | § 1983 Civil Rights |

# Amended
# Verified Complaint

## Introduction

1. The defendants kept Plaintiff in solitary confinement. He spent his days and nights alone in a prison cell, deprived of meaningful social interaction, adequate physical exercise, and human touch.

2. Defendants subjected Plaintiff to these conditions despite their awareness of the grave detrimental effects of solitary confinement on people in general, and especially on people with known mental illness diagnoses like Plaintiff's.

3. Defendants kept Plaintiff in solitary confinement pursuant to a policy under which all prisoners with death sentences were permanently held in solitary confinement with no individualized review nor possibility of release into the general population.

4. These conditions exacerbated Plaintiff's pre-existing mental illness, caused him grave psychological harm, and caused or exacerbated various physical ailments that still affect him to this day.

5. By subjecting Plaintiff to these inhumane conditions, with no means for him to challenge them, the defendants violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act, and the Rehabilitation Act.

## Jurisdiction and Venue

6. Plantiff brings this action pursuant to 42 U.S.C § 1983; Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

7. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(4).

8. This Court is the appropriate venue under 28 U.S.C. § 1391.

## Parties

9. Plaintiff is a death-sentenced person currently incarcerated in the Pennsylvania Department of Corrections at State Correctional Institution ("SCI") Phoenix, 1200 Mokychic Drive, Collegeville, PA 19426.

10. Defendant John Wetzel was the Secretary of the Pennsylvania Department of Corrections ("DOC") from 2011 through October 1, 2021, his primary business address was 1920 Technology Parkway, Mechanicsburg, PA 17050.

11. As Secretary, Defendant Wetzel was the highest-ranking official of the DOC and was responsible for the oversight, operation, and administration of the Commonwealth's prison system, including approving all DOC policies. He is being sued in his individual and official capacity.

12. Defendant Pennsylvania Department of Corrections is an agency of the Commonwealth of Pennsylvania that is responsible for the operation of Pennsylvania's twenty-four state prisons. The DOC's central office is located at 1920 Technology Parkway, Mechanicsburg, PA 17050.

13. The DOC receives federal funding and is responsible for, among other things, providing prisoners safe and humane housing, adequate health care, and rehabilitative programming.

## Statement of Facts

### Plaintiff's History of Mental Illness

14. Plaintiff is mentally and intellectually disabled. History of
    diagnosis: between the years 1995-2021 Doctors Ragusea, Fox,
    Blumberg, Gelles, Atkins and Glushakow (discovery is needed to
    determine other DOC doctors) diagnosed Plaintiff with Chrionic-
    Severe PTSD with dissociative symptoms, borderline personality
    disorder, OCD, Mixed personality disorder with dependent,
    schizotypal, borderline and antisocial features, dependent
    personality disorder, ADHD, poly-substance abuse, and Bipolar
    Disorder. Plaintiff's "mental and emotional deficits are **extremely
    serious** and involve **debilitating** mental, emotional and cognitive
    **impairments**" (Ragusea); "**extreme** mental and emotional **disturbance**
    that **significantly impairs** judgment" (Blumberg);
    "disorders/impairments are **treatable**, recommend **treatment**, and
    [Plaintiff] is likely to respond well to **treatment**" (Gelles).

15. History of medication between the years 1995-2021: Vistiril,
    clonopin, zoloft, prozac, risperdol, remeron, trilafon, prolizin,
    effexor, wellbutrin, lithium.

### DEFENDANT' KNOWLEDGE OF PLAINTIFF'S DISABILITY

16. On numerous occassions Defendants were provided with all of the
    psychological/psychiatric reports of the doctors.

17. The defendants played a role in diagnosing Plaintiff's disabilits.

18. Defendants provided all of the above listed medications yet failed
    to accommodate the disabilities.

19. Defendants designated Plaintiff **stability code** D reserved for the
    most seriously mentally disabled yet failed to accommodate his
    disability.

## Plaintiff's Long-Term Solitary Confinement

20 Despite his history of serious mental illness and ongoing symptoms, the DOC placed Plaintiff in solitary confinement upon his admission to the DOC and kept him in such conditions for the next 25 years.

21 Plaintiff was placed in solitary confinement pursuant to a DOC policy under which all death-sentenced prisoners were automatically placed in permanent solitary confinement with no individualized assessment nor possibility of release to the general population.

22 Under this policy, death-sentenced prisoners with mental illnesses, psychiatric disabilities, or intellectual disabilities were subjected to the same solitary confinement conditions, described below, as all other death-sentenced prisoners.

23 Because of the judicial review process for death sentences, it was common for death-sentenced prisoners in the DOC, like Plaintiff, to spend a decade plus in solitary confinement.

24 The DOC did not individually evaluate Plaintiff or other death-sentenced individuals with psychiatric disabilities to determine whether they could safely be placed in general population.

25 There was no way for Plaintiff or other death-sentenced prisoners to challenge their prolonged solitary confinement.

26 There was no review process available that could have led to Plaintiff or other death-sentenced prisoners being released from solitary confinement.

27 Plaintiff's prolonged confinement lacked any legitimate penological justification.

28 Solitary confinement (also referred to as "restrictive housing," "segregation," or "isolation,") is any type of detention that involves removal from the general population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another prisoner; inability to leave the room or cell for the vast majority of the day, typically 22 hours or more; extremely

limited or no opportunities for direct and normal social contact with other human beings; and extremely limited or no opportunities for purposeful out-of-cell activity.

29. During his years in isolation, Plaintiff was confined alone in a small cell that measured about seven by twelve feet, where he ate, slept, used the toilet, and spent almost all his waking hours.

30. Plaintiff's cell and block were illuminated 24 hours a day; the light interfered with his sleep.

31. Plaintiff was deprived of meaningful social interaction.

32. Plaintiff was deprived of all caring human touch, receiving neither handshakes, hugs, nor other physical contact with other human beings, aside from incidental contact with staff members.

33. The only visits Plaintiff was permitted, even with his attorney, were "non-contact" visits, with a physical barrier between him and the visitor. Even handshakes were prohibited.

34. Plaintiff was prohibited from participating in congregate religious activities.

35. Plaintiff was prohibited from participating in any educational or other programming.

36. On weekday mornings, weather permitting, Plaintiff was allowed to go outside for two hours in a fenced-in enclosure, not much larger than his cell, without exercise equipment of any kind.

37. On weekends, Plaintiff was confined in his cell for up to seventy consecutive hours, between Friday morning and Monday morning. When a holiday abutted a weekend, this period of total isolation was extended by an additional twenty-four hours.

38. Due to his depression, Plaintiff was not able to take advantage of the limited opportunities for out-of-cell time that were offered. He left his cell at most a few times a week, and often less.

39. When check-ins by DOC mental health professionals were conducted, they were very brief, non-confidential, and through the cell door, and they typically consisted of nothing more than staff members asking how Plaintiff was doing.

## Ordinary Incidents of Prison Life

40 The averments in this subsections do not apply to the plaintiff but to the baseline operations of general population ("G.P.") in the Pa. DOC under normal conditions.

41 Upon entering the DOC, every prisoner is given an individualized assessment and is subject to a classification procedure to determine the appropriate level of housing.

42 Even those classified to be housed at maximum-security institutions (such as Greene, Graterford, and Phoenix) are subject to comparatively fewer restrictions.

43 G.P. prisoners can be subjected to limited periods of solitary confinement only for specific reasons (e.g., disciplinary infractions, particular security threats, etc.)

44 G.P. prisoners live in cell-block settings with constant opportunity for social interaction.

45 G.P. prisoners' cells are not constantly illuminated.

46 G.P. prisoners generally may shower and shave on a daily basis.

47 G.P. prisoners have multiple hours-long periods of congregate indoor/outdoor recreation per day.

48 G.P. prisoners have access to outdoor yards, which feature grassy areas, exercise equipment, etc.

49 G.P. prisoners have access to facility law libraries, which are comparatively well equipped with computers (featuring legal databases and word-processing software) and physical books.

50 Depending on the institution, G.P. prisoners are typically permitted to make as many telephone calls as they can afford.

51 G.P. prisoners are permitted four contact visits per month, each of which may last as long as available space permits (typically up to 8 hours at some institutions).

52 G.P. prisoners are permitted to dine in communal settings.

53 G.P. prisoners are permitted to participate in congregate religious services at facility chapels.

54 G.P. prisoners have access to vocational training.

55. G.P. prisoners have a wide range of prison employment opportunities, which can financially sustain them.

56. G.P. prisoners have access to education.

57. G.P. prisoners are permitted—indeed often required—to participate in corrective/rehabilitative programming.

58. G.P. prisoners are permitted to participate in organized recreational activity (e.g., team sports, music concerts, art projects, etc.).

59. G.P. prisoners received thier medical care at comparatively well-equipped infirmaries and medical triage wards, where they are afforded private consultations.

60. G.P. prisoners are, of course, eligible to be strip searched at any time, but are not subjected to mandatory strip-searching except in limited circumstances (e.g., after outside hospital trips, contact visits, for a particular security-related threat, etc.).

## Eventual Amelioration of Plaintiff's Conditions

61. Plaintiff remained in solitary confinement until December 2019, when the DOC implemented a new policy for death-row prisoners as a result of the settlement agreement in a class action lawsuit, *Reid v. Wetzel,* 1:18-CV-00176 (M.D. Pa), which sought injunctive and declaratory relief on behalf of death-sentenced prisoners.

62. Even after that, Plaintiff and the other death-sentenced prisoners remained segregated from the general prison population and were denied, among other things, the opportunity to participate in programming.

63. It was not until January 2022 that Plaintiff was given the opportunity to participate in educational, religious, and recreational programming.

64 Between the spring of 2018 and December 2019, at SCI Greene, where Plaintiff was housed, some changes were made in the conditions described above. However, Plaintiff still suffered the deprivations, including deprivation of meaningful social interaction, human touch, physical exercise, and the opportunity to participate in group activities, and was still forced to spend the vast majority of his days and nights alone in a cell.

65 While these changes could have theoretically led to a marginal improvement in Plaintiff's conditions of confinement, they were inconsistently implemented.

66 Officers who worked on the capital-case unit regularly said that they were not obligated to follow the new procedures at SCI Greene because the DOC's central office had not changed the state-wide policy for death-sentenced prisoners.

67 Michael Zaken, who was then Deputy Superintendent at SCI Greene, told Plaintiff that the changes could be reversed at any time by central office.

68 Moreover, Plaintiff and other death-sentenced prisoners were not give any preparation for these changes or provided any orientation to being around people again after decades in isolation.

69 As a result, Plaintiff and many of the other men were unable to take advantage of the opportunities for out-of-cell time with others that were offered.

70 Despite the changes in policies—and limited changes in practices—at SCI Greene, DOC policy with respect to housing and conditions of confinement for death-sentenced prisoners did not change until December 2019, after the *Reid* settlement agreement took effect.

## Defendants' Awareness of the Devastating Effects
## of Prolonged Solitary Confinement

71 As recognized in medical and psychological literature, prolonged solitary confinement causes serious physical and psychological harm to humans.

72  People in solitary confinement are deprived of meaningful social contact and caring human touch, both of which are fundamental human needs.

73  People who have been held in solitary confinement are at increased risk of decompensating and of experiencing psychotic episodes, including auditory and visual hallucinations.

74  Solitary confinement has been shown to cause and exacerbate mental illness such as depression and anxiety and can cause severe mental deterioration and decreased cognitive functioning.

75  People who are subjected to solitary confinement often experience extreme feelings of hope-lessness, despair, rage, and anger; they experience paranoia and distrust of other people and, due to a lack of social interaction, they can lose the ability to interact with other people.

76  Solitary confinement increases the risk of suicide and suicide attempts.

77  Solitary confinement has also been linked to adverse physical effects, including skin conditions such as rashes and dry, flaky skin; Vitamin D deficiency due to lack of sunlight; and hypertension.

78  Solitary confinement can also exacerbate musculoskeletal pain and cause fluctuations in body weight and loss of muscle mass.

79  Chronic sleep disturbance and the adverse health impacts associated with it are another common effect of solitary confinement.

80  All of these impacts of solitary confinement—psychological, emotional, and physical—are intensified for people who suffer from serious mental illness.

81  Recognition of the severe and lasting impacts of solitary confinement is not limited to research-ers and scientists. Over the past decade, courts, non-governmental organizations, legislatures, voters, and prison officials have expressed understanding of—and concern about—and the many ways solitary confinement harms individuals, as well as society.

82. In 2017, the Third Circuit Court of Appeals "acknowledge[d] the robust body of legal and scientific authority reorganizing the devastating mental health consequences caused by long-term isolation in solitary confinement." *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017).

83. The Third Circuit "observed a growing consensus . . . that [solitary confinement] conditions . . . cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity," as well as physical harm, including suicide and self-mutilation. *Id.* at 225–26 (citing *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 566–68 (3d Cir. 2017)).

84. In 2015, in its Standard Minimum Rules for the Treatment of Prisoners (the "Nelson Mandela Rules"), the United Nations characterized indefinite solitary confinement and prolonged solitary confinement in excess of fifteen days as amounting to "torture or other cruel, inhuman, or degrading treatment" and declared that such practices should be prohibited.

85. The U.N.'s Standard Minimum Rules also state that "solitary confinement should be prohibited in the case of prisoners with mental or physical disabilities when their conditions would be exacerbated by such measures."

86. DOC officials, including Defendant Wetzel, have been aware of the psychological and physical dangers of solitary confinement and prolonged isolation, in general, as well as the even greater risk these conditions pose for people with serious mental illness, for many years.

87. In 2014, the Civil Rights Division of the U.S. Department of Justice completed an investigation of the DOC's use of solitary confinement for prisoners with serious mental illness and/or intellectual disabilities, including death-sentenced prisoners, and issued findings that the DOC's practices violated those prisoners constitutional rights and their rights under Title II of the ADA. *See* U.S. Dep't of Justice, *Investigations of the Pa. Dep't of Corrections' Use of Solitary*

*Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities* (2014).

88. The DOJ investigation noted that, from January 1, 2012, through May 31, 2015, more than 70% of suicide attempts in the DOC occurred in solitary confinement units. *Id.* at 11.

89. Throughout the DOC's investigation, DOC officials, including Defendant Wetzel, expressed an understanding of the serious harm caused to prisoners by solitary confinement.

90. In 2015, as a result of the Settlement Agreement in *Disability Rights Network v. Wetzel*, 1:13-CV-00635 (M.D. Pa.), the DOC made changes to the conditions of confinement for individuals with serious mental illness and/or intellectual disabilities in administrative custody or disciplinary custody, providing them increased out-of-cell time and access to programming as compared to other individuals in solitary confinement; but these changes did not apply to similarly situated death-sentenced prisoners.

91. At least three death-sentenced prisoners died by suicide while in DOC custody between 1983 and 2019, including one in 2008 and one in 20009.

92. In 2016, a court found that Wetzel "knows well the risks inherent in prolonged isolation . . . [and has] stated he is familiar with the [scholarly literature] which sets forth at length the harmful effects of solitary confinment." *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 779 (M.D. Pa.).

93. Indeed, the "substantial risks of prolonged solitary confinement are obvious, longstanding, pervasive, well-documented, [and] expressly noted by [DOC] officials in the past." *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 445 (3d Cir. 2020) (cleaned up).

94. In February 2017, attorneys from the American Civil Liberties Union and other civil rights firms sent a letter to Defendant Wetzel urging him to end the DOC's policy of automatically placing death-sentenced prisoners in permanent solitary confinement.

95. In their letter, the attorneys summarized the scholarly literature on the harms of solitary

confinement and cited numerous examples of other states that had eliminated the automatic

placement of death-sentenced prisoners in solitary confinment.

96 Defendants Wetzel and the DOC, through the DOC's Chief Counsel, responded to the letter and

stated that they would be maintaining their policy and practice of automatic and permanent sol-

itary confinement for all death-sentenced prisoners.

## The Effects of Prolonged Solitary Confinement on Plaintiff

97 The solitary confinment conditions to which Plaintiff was subjected were detrimental to his phys-

ical and psychological well-being.

98 While in solitary confinment, Plaintiff developed the following physical symptoms or conditions

as a result of his conditions, most of which still affect him: severe headaches; blackouts;

joint pain; abdominal pain; muscle pain in neck and back; stress-related stomach pain.

99 His depression, suicidality, and other mental-illness symptoms were also exacerbated by his time

in solitary confinement. While in isolation, he experienced: intrusive thoughts; over-sensitivity to

external stimuli; irrational anger; irritability; difficulty with attention and memory; obsessive

behaviors; suicidal ideation; a tendency to withdraw.

100 Now that Plaintiff is out of solitary confinement, he no longer feels suicidal and is trying his best

to adjust to being around other people again.

101 While Plaintiff still struggles with  mental illness and the effects of a decade plus of isolation, his

overall mood and ability to interact with others have improved dramtically, demonstrating that

the symptoms he experienced while in solitary confinement were caused by the conditions to

which he was being subjected, not merely by his pre-existing mental illness.

## Causes of Action

### Count I
### Eighth Amendment - Conditions of Confinement
### Plaintiff v. Wetzel & Pa. DOC

102 All relevant factual averments contained in this complaint, and in *Reid v. Wetzel*, 18-CV-00176,

Doc. 1, are hereby incorporated into this cause of action.

103 Defendants violated Plaintiff's right under the Eighth Amendment, by acts and omissions that

caused him to be subjected to conditions that deprived him of the minimal civilized measure of

life's necessities, including but not limited to physical health, mental health, environmental

stimulation, social interaction, sleep, adequate exercise, and basic human dignity.

104 The condition of the plaintiff's confinement had a mutually reinforcing effect that, in totality,

produced the deprivation of fundamental human needs.

105 Defendants committed these acts and omissions with deliberate indifference to Plaintiff's

ongoing suffering and to the substantial risks of serious physical and psychological harm.

106 Defendants subjected Plaintiff to the conditions described above without legitimate penological

justification.

107 Defendants' acts and omissions caused substantial physical and psychological harm to Plaintiff

and exposed him to a substantial risk of future harm, including permanent psychological dam-

age and death by suicide.

108 The defendants' indifference to Plaintiff's federally protected rights was reckless and callous.

### Count II
### Fourteenth Amendment - Substantive & Procedural Due Process
### Plaintiff v. Wetzel & Pa. DOC

109 All relevant factual averments contained in this complaint, and in *Reid v. Wetzel*, 18-CV-00176,

Doc. 1, are hereby incorporated into this cause of action.

110 Plaintiff has a constitutionally protected liberty interest in avoiding the prolonged solitary confinement to which the defendants subjected him.

111 Because of the duration and conditions of his confinement, they constituted an atypical and significant hardship in relation to the ordinary incidents of prison life.

112 Defendants violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment by failing to provide him with any individualized review of his continued placement in solitary confinement and failing to provide him with any meaningful opportunity to challenge his continued placement in solitary confinement.

113 Defendants' acts and omissions caused substantial physical and psychological harm to Plaintiff and exposed him to a substantial risk of future harm, including permanent psychological damage and death by suicide.

114 The defendants' conduct—subjecting the plaintiff (indefinitely and without legitimate rationale) in depraved conditions they knew were certain to be harmful—shocks the conscience.

## Count III
### Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.*
### Plaintiff v. Pa. DOC

115 All relevant factual averments contained in this complaint, and in *Reid v. Wetzel*, 18-CV-00176, Doc. 1, are hereby incorporated into this cause of action.

116 Defendant Pennsylvania Department of Corrections is a public entity under Title II of the ADA.

117 Plaintiff is a qualified individual with a disability under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131.

118 The DOC and its employees, including Defendant Wetzel, knew that Plaintiff was a qualified individual with a disability covered by the protection of the ADA.

119 As a result of his mental illness and cognitive impairments, throughout his time in the DOC,

Plaintiff has experienced substantial limitations in several major life activities, including concentration, memory, communication, sleeping, and thinking, among others.

120 The DOC, with knowledge that Plaintiff's federally protected rights were likely to be violated, subjected him to discrimination by reason of his psychiatric disabilities precluding him from participating in programs, services, and activities and by failing to make reasonable modifications to its policies and procedures to account for the particular riks posed to him by isolation.

121 Unnecessary segregation of individuals with disabilities in the provision of public services is itself a form of discrimination.

122 Intentional discrimination can be inferred from the defendants' deliberate indifference to the risk that the plaintiff's rights were substantially likely to be violated and their failure to act upon that knowledge.

123 Defendants failed to respond to a historical pattern of injuries inflicted upon prisoners subjected to identical forms of discriminatory isolation.

Count IV
Rehabilitation Act, 29 U.S.C. § 794
Plaintiff v. Pa. DOC

124 All relevant factual averments contained in this complaint, and in *Reid v. Wetzel*, 18-CV-00176, Doc. 1, are hereby incorporated into this cause of action.

125 Plaintiff is a qualified individual with disability within the meaning of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.

126 At all times relevant to this complaint, Defendant Pennsylvania Department of Corrections receives federal funding.

127 The DOC and its employees, including Defendant Wetzel, knew that Plaintiff was a qualified individual with a disability covered by the protection of the RA.